**UNITED STATES BANKRUPTCY COURT**　　　　<u>FOR PUBLICATION</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:　　　　　　　　　　　　　　　　　　　Chapter 11

AMR CORPORATION, *et al.*,　　　　　　　　　Case No. 11-15463 (SHL)

　　　　　　　　　Reorganized Debtors.　　　　(Jointly Administered)
-----------------------------------------------------------x
AMR CORPORATION, *et al.*,

　　　　　　　　　Plaintiffs,

　　　　v.　　　　　　　　　　　　　　　　Adv. Pro. No. 12-01744 (SHL)

COMMITTEE OF RETIRED EMPLOYEES,

　　　　　　　　　Defendant.
-----------------------------------------------------------x


<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**GROOM LAW GROUP, CHARTERED**
*Counsel for the Debtors*
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
By:　　Gary M. Ford, Esq.
　　　　Edward J. Meehan, Esq.
　　　　Lonie A. Hassel, Esq.
　　　　Lars C. Golumbic, Esq.
　　　　Sarah A. Zumwalt, Esq.

**WEIL, GOTSHAL & MANGES LLP**
*Counsel for the Debtors*
767 Fifth Avenue
New York, New York 10153
By:　　Harvey R. Miller, Esq.
　　　　Stephen Karotkin, Esq.
　　　　Alfredo R. Pérez, Esq.

**JENNER & BLOCK LLP**
*Counsel for the Section 1114 Committee of Retired Employees*
353 North Clark Street
Chicago, Illinois 60654
By:      Catherine L. Steege, Esq.
         Charles B. Sklarsky, Esq.
         Melissa M. Hinds, Esq.


-and-


919 Third Avenue, 37th Floor
New York, New York 10022
By:      Marc B. Hankin, Esq.


**SKADDEN ARPS SLATE MEAGHER & FLOM LLP**
*Counsel for the Official Committee of Unsecured Creditors*
Four Times Square
New York, New York 10036
By:      Jay M. Goffman, Esq.


-and-


155 North Wacker Drive
Chicago, Illinois 60606
By:      John Wm. Butler, Jr., Esq.
         Albert L. Hogan III, Esq.
         Ron E. Meisler, Esq.
         Carl T. Tullson, Esq.


**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

The Debtors AMR Corporation and American Airlines, Inc. (together, the "Plaintiffs")

commenced this adversary proceeding, seeking a declaratory judgment that the health and

welfare benefits they currently provide to their retirees have not vested but instead may be

unilaterally modified by Plaintiffs.  The Plaintiffs seek to shift the cost of these programs entirely

from the company to the retirees themselves.

Before the Court is Plaintiffs' motion seeking summary judgment on the question of whether the benefits are vested (the "Motion") (ECF No. 13).[1] The Motion is opposed by the Section 1114 Committee of Retired Employees (the "Defendant"), which was appointed in the above-captioned bankruptcy proceeding under Sections 1114(c) and (d) of the Bankruptcy Code to represent the interests of individuals receiving retiree benefits from the Debtors.  Under Section 1114(b)(2) of the Bankruptcy Code, the Defendant has the power to protect the rights of these retirees under the Bankruptcy Code with respect to their retiree health and welfare benefits.

The Motion requires the Court to examine whether the relevant documents are reasonably susceptible to interpretation as a promise to provide benefits for life.  As explained below, this inquiry turns in part on what documents should be considered as relevant to vesting of benefits. The Plaintiffs contend that none of the operative documents can be read as a promise to provide benefits for life and that the documents reserve the right to modify the benefits.  But for reasons set forth below, with limited exceptions, the Court denies the Motion because the relevant documents contain language reasonably susceptible to interpretation as a promise to vest benefits and lack language categorically reserving the Plaintiffs' right to terminate their contributions to the retiree benefits.

## BACKGROUND

In November 2011 (the "Petition Date"), the Debtors filed for relief under Chapter 11 of the Bankruptcy Code.  *See* Chapter 11 Petition (Main ECF No. 1).  As part of their reorganization efforts, the Debtors sought to renegotiate their existing collective bargaining agreements ("CBAs") with the labor unions that represent American Airlines employees.  The Debtors successfully renegotiated CBAs with the Association of Professional Flight Attendants

---

[1]     Record citations to the Debtors' main bankruptcy case (Case No. 11-15463) are identified as "Main ECF No." while citations to the Adversary Proceeding record (Case No. 12-01744) are reflected as "ECF No."

("APFA") and the Transport Workers Union ("TWU"), and the Court approved the corresponding settlements. (Main ECF Nos. 4413 & 4414).

But the Debtors did not reach an agreement with the Allied Pilots Association (the "APA"). After extensive litigation, the Debtors were granted authority to abrogate the APA CBA pursuant to Section 1113 of the Bankruptcy Code. *See In re AMR Corp.*, 477 B.R. 384 (Bankr. S.D.N.Y. 2012); *In re AMR Corp.*, 478 B.R. 599 (Bankr. S.D.N.Y. 2012). After abrogating that CBA, the Debtors subsequently negotiated a new contract with the APA, and that new CBA was approved by this Court at the end of 2012. *See* Order Authorizing Entry Into CBA with APA (Main ECF No. 5800).

Having modified the benefits provided to current employees, Debtors have turned their attention to the health and welfare benefits provided to American's retired employees (the "Retiree Benefits"). The Retiree Benefits generally include medical coverage for retirees who are not yet 65, medical coverage for those over 65, and life insurance. *See* Motion at 1–2. For most retirees, medical coverage is either wholly or partially funded by the Debtors. *Id.* With respect to medical coverage for retirees who previously worked at Trans World Airlines ("TWA") before its merger with American, however, the Debtors fund pre-65 coverage with retiree and company contributions, but the 65 and over coverage is funded solely by retiree contributions. *Id.* The Debtors also fully fund life insurance for all retired employees, including the TWA Retirees. *Id.* The Debtors now seek to shift the entire cost of all these programs to the retirees themselves while still providing retirees access to benefits at group rates. *See* Jan. 23, 2013 Hr'g Tr. 36:10–23 (ECF No. 72).

As of the Petition Date, the Debtors provided Retiree Benefits to approximately 46,930 retirees. These retirees can be grouped into several distinct categories: (1) retired union

employees from the APA, APFA, and TWU (together the "Union Retirees"); (2) retired TWA employees; and (3) retired non-union employees (the "Non-Union Retirees"). *See* Motion at 1; Defendant's Statement of Additional Material Facts ("SAMF") ¶ 4 (ECF No. 27). Among these groups, the terms of the Retiree Benefits vary. The terms further depend on when the employee retired and whether they opted into any early retirement or prefunding agreement with American. These terms are set forth in four sets of documents.[2]

The first of these are so-called "plan documents," that is to say documents that have been prepared by the employer sponsoring the plan or the plan administrator. *See* Dep. of Mary Anderson, Oct. 25, 2012 ("Anderson Dep."), RC Ex. 2 at 30:3–10; Dep. of Tricia Herschell, Oct. 30, 2012 ("Herschell Dep."), RC Ex. 6 at 52:13–53:6. These plan documents describe the terms and conditions of the employer's sponsored health insurance coverage, life insurance, and other benefits offered to its employees. Historically, American issued a single plan document (the "Omnibus Plan Document"), which sets out the provision of Retiree Benefits for most employee groups.[3] Generally, the Omnibus Plan Documents lacked language promising vested benefits, but they did contain language reserving the company's right to modify or terminate the benefits. Although the language varies slightly, the plan documents generally provided that American

---

[2]    The Plaintiffs submitted the declaration of Mary E. Anderson, the Managing Director of Health and Welfare at American Airlines, in support of their Motion ("Anderson Decl.") (ECF No. 15). The Plaintiffs did not submit any of the actual documents, but rather attached several charts as exhibits to the Anderson Declaration. These charts summarize the applicable language relied upon by Plaintiffs. For the purposes of this decision, the Court will refer to the Plaintiffs' exhibits as "Anderson Decl. Ex. __". Each of these charts can be found at ECF No. 15.

By contrast, the Defendant submitted over 200 exhibits, including the actual documents, as attachments to its SAMF (ECF No. 27). The Appendix to the SAMF (ECF No. 33) lists the name of each exhibit. The exhibits can be found at ECF Nos. 34–36. For the purposes of this decision, the Court will use the parties' naming convention and refer to these exhibits as "RC Ex. __". Because some of these voluminous exhibits lack page numbers or contain several sets of page numbers, all references to page numbers will correspond to the PDF page number of each exhibit.

[3]    American issued an Omnibus Plan Document in 1962, 1965, 1969, 1975, 1988, 1992, 1999, 2005, 2010, 2011, and 2012. *See* Motion at 13–14 (ECF No. 13); Anderson Decl. Ex. 1; RC Exs. 26–32, 37–40.

"hopes and expects to continue this plan indefinitely, but necessarily must reserve the right to modify, suspend, or terminate it at any time."[4]  For a period during the 1980s, however, American issued separate plan documents to cover several specific employee groups rather than an Omnibus Plan Document.[5]  During that time period, only the 1985 Pilots' Plan Document contained the reservation of rights.  *See* RC Ex. 33 at 6.

The second group of documents is the CBAs between American and its labor unions (the APFA, the TWU, and the APA).  Unlike plan documents, the CBAs are not drafted by the employer but rather are contracts that are the product of negotiations between the employer and the unions.  *See* SAMF ¶¶ 100–01.  The applicable CBAs for each union set forth the terms of employment for those employees, including the benefits that employees would receive upon retirement.  *Id.*  Over time, the unions and American renegotiated the terms of the CBAs, often by appending documents to the CBAs.  These amendments are often referred to as "supplements," "attachments," or "letters."  *See* RC Ex. 21 ¶ 16 (discussing how provisions, letters, and supplements have been made part of CBAs); *see, e.g.,* 1985 APA CBA, RC Ex. 89 at 4–5 (Table of Contents, Supplemental Agreements, and Letters listed).  The CBAs and certain of these amendments contained language that the Defendant claims: (1) prohibits the elimination of benefits, or (2) vests the benefits by linking the right to receive them with the retirees' age or status.  The CBAs for each union contain distinct language, and that language further varies

---

[4]        For the specific language of each Omnibus Plan Document, *see* RC Ex. 40 at 25; RC Ex. 39 at 12; RC Ex. 38 at 10; RC Ex. 37 at 7; RC Ex. 32 at 4; RC Ex. 31 at 4; RC Ex. 30 at 41; RC Ex. 29 at 3; RC Ex. 28 at 5; RC Ex. 27 at 6; RC Ex. 26 at 6.  Because the language of the Omnibus Plan Documents is similar throughout the years, the Court will cite to representative examples from the Omnibus Plan Documents for the purposes of this decision. These examples merely highlight the type of language that creates uncertainties in this case and renders summary judgment inappropriate.

[5]        *See* 1980 Non-Union Plan Document, RC Ex. 36; 1982 TWU Plan Document, RC Ex. 35; 1983 Flight Engineer's Document, RC Ex. 34.

among the different versions of a CBA negotiated over time with each union.  As such, the Court

will address the specific language of the CBAs in the ensuing analysis.

The third group of documents concerns only the benefits of retirees who previously

worked for TWA airlines.  These benefits were the subject of agreements between TWA and

American in TWA's own bankruptcy proceeding more than a decade ago.  *See* RC Exs. 192,

206.  During that case, American entered into an agreement to purchase assets of TWA pursuant

to Section 363 of the Bankruptcy Code, which provides—among other things—for the sale of

debtor's property outside the ordinary course of business (the "TWA Purchase Agreement").

Pursuant to the TWA Purchase Agreement, American agreed to assume liability for TWA retiree

benefits but did not assume the actual TWA retiree benefit plans.  *See* RC Ex. 192.  American

further agreed to provide TWA employees who joined American with retiree benefits "no less

favorable" than those benefits provided to American's own employees.  RC Ex. 25 at 216–17

(Ex. K, §10.1).

Prior to the closing of the sale, TWA filed a motion pursuant to Section 1114 seeking to

substitute its own obligations with respect to retiree benefits with those that American contracted

to assume under the TWA Purchase Agreement.  The TWA bankruptcy court granted that

motion, stating, "[T]he obligation of TWA to provide retiree benefits . . . shall terminate at the

closing of the Asset Purchase Agreement . . . by and between [TWA] and [American]."  RC Ex.

206.  In the same order, the court approved an agreement between TWA, the retiree committee

appointed in the TWA bankruptcy, and American, with that agreement requiring American to

provide the TWA retiree committee with a calculation of the liability that American would

assume and a description of the benefits that American would provide.  This agreement stated,

"TWA and [American] will present to the Official Retirees' Committee their calculations of the

Closing Date amount of liability" under the TWA Purchase Agreement. RC Ex. 206. In a subsequent court filing, American represented to the TWA bankruptcy court that it would provide benefits to the TWA Retirees that had a value of $644.9 million. *See* RC Ex. 213 ¶ 2. According to the Defendant, American has paid the TWA Retirees benefits in the amount of $239,487,053 through 2011, and thus has not satisfied its $644.9 million liability. *See* RC Ex. 218 at 4 (Debtor's Response to Interrogatory No. 15).

Fourth and finally, there are documents relating to other retirement options, including early retirement and prefunding options under special programs offered by the Debtors. The Debtors offered enhanced retiree benefits in 1987, 1994, and 1995 to encourage some employees to take early retirement. In 1987, for example, American offered an early-out program to certain non-union and TWA employees. An offer letter was sent to these employees, detailing three early retirement options. *See* RC Ex. 268 at 3. In 1994 and 1995, American offered similar early retirement programs to non-union, TWU, and APFA employees. *See* RC Exs. 223, 230, 76. For the non-union and TWU employees, American once again sent out offer letters detailing terms. For APFA employees, the terms were set forth in Appendix HH, which was appended to the APFA CBA. *See* RC Ex. 76.

Debtors also offered—and in some cases required—employees to prefund a portion of their retiree medical benefits. In certain years, union employees had the option to enter a prefunding agreement. The TWU and APFA included such prefunding options in their 1989 and 2001 CBAs. *See* 1989 TWU Dispatchers CBA, RC Ex. 121 at 36; 2001 APFA CBA, RC Ex. 77 at 361. Since 1990, the Debtors have required that Non-Union Retirees prefund a portion of their retiree medical benefits while they were active employees. *See* 1990 Trust Agreement for Prefunding Contributions, RC Ex. 219; *see also* Letter to AA Employees regarding Prefunding,

RC Ex. 220 at 17.  Under the prefunding programs, active employees paid a set amount each

month, which was then matched by American.  *Id.*; s*ee also* Dep. of James B. Weel, Oct. 29,

2012 ("Weel Dep."), RC Ex. 11 at 144:7–146:6.  The funds were held in trust and, upon

retirement, would be distributed by American in equal installments over a period of ten years.

RC Ex. 220 at 8–9.  The specific language of each of those documents varies.

## DISCUSSION

### I.    Applicable Legal Standards

The Declaratory Judgment Act provides, in part, that

> [i]n a case of actual controversy . . . any court of the United States,
> upon the filing of an appropriate pleading, may declare the rights
> and other legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be sought.
> Any such declaration shall have the force and effect of a final
> judgment or decree . . . .

28 U.S.C. § 2201(a).  The purpose of the Declaratory Judgment Act is to "enable parties to

adjudicate disputes before either of them [has] suffered great harm."  *Russian Standard Vodka*

*(USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 381 (S.D.N.Y.

2007) (citing *In re Combustion Equip. Assoc., Inc.*, 838 F.2d 35, 36 (2d Cir. 1988)).  In

determining whether a party has standing to seek a declaratory judgment, "the question in each

case is whether the facts alleged, under all the circumstances, show that there is a substantial

controversy, between the parties having adverse legal interests, of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genentech, Inc.*,

549 U.S. 118, 127 (2007).  A court has wide discretion in determining whether a declaratory

judgment is appropriate in a particular dispute.  *See Russian Standard Vodka*, 523 F. Supp. 2d at

382 (citing *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 675

(2d Cir. 1996)).  The Court finds that the present dispute satisfies the requirements for a

declaratory judgment.

It is appropriate for the Court to grant summary judgment "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R.

Civ. P. 56(c) (made applicable to the adversary proceeding by Fed. R. Bankr. P. 7056).  All

inferences to be drawn from the underlying facts must be viewed in the light most favorable to

the party opposing the motion.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Ames

Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc.* (*In re Ames Dep't Stores, Inc.*), 161 B.R. 87,

89 (Bankr. S.D.N.Y. 1993).  The party moving for summary judgment bears the initial burden of

identifying those portions of the pleadings, discovery, and affidavits that demonstrate the

absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  Once the moving

party meets this initial burden, the non-moving party must go beyond the pleadings and by its

own evidence set forth "specific facts showing that there is a genuine issue for trial."  Fed. R.

Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

"ERISA is a comprehensive statute designed to promote the interests of employees and

their beneficiaries in employee benefit plans."  *Shaw v. Delta Air Lines*, 463 U.S. 85, 90–91

(1983) (citing *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361–62 (1980);

*Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 (1981)).  "Employee benefit plans"

encompasses both pension plans and employee welfare benefit plans.  *Shaw*, 463 U.S. at 90–91.

ERISA sets various uniform standards, including rules concerning reporting, disclosure, and

fiduciary responsibility, for both pension and welfare plans.  *Id.* (citing ERISA §§ 101–111, 401–414, 29 U. S. C. §§ 1021–1031, 1101–1114 (1976 ed. and Supp. V)).

While ERISA imposes participation, funding, and vesting requirements on pension plans, *see Shaw*, 463 U.S. at 91, the statute does not create an entitlement to health or welfare benefits. *Curtiss-Wright v. Schoonejongen*, 514 U.S. 73, 78 (1995).  Employers are therefore free under ERISA to unilaterally adopt, modify, or terminate health or welfare plans unless the benefits are otherwise protected.  *Id.; see also Int'l. Union, UAW v. ALCOA*, 932 F. Supp. 997, 1004 (N.D. Ohio 1996).  "Nothing in ERISA, however, forbids or prevents an employer from agreeing to vest employee welfare benefits or from waiving its ability to terminate or amend unilaterally a plan . . . ."  *Schonholz v. Long Island Jewish Medical Ctr.*, 87 F.3d 72, 77 (2d Cir. 1996).  Even though employers are generally free under ERISA to modify welfare benefits, if the employer promised to vest benefits, that promise will be enforced.  *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 82 (2d Cir. 2001).

## II.      The Relevant Factual Record

### A.      The Court Should Review the CBAs

As a threshold issue, the Court must decide what evidence should be considered in resolving the vesting issue.  The parties have submitted extensive evidence in support of their legal positions, but they have markedly different views on what evidence should be considered.  Plaintiffs maintain that the Court should examine only the "governing plan documents," which Plaintiffs identify—with a few exceptions—as the "Omnibus Plan Documents."  Motion at 11–12.[6]  As only formal plan documents can vest benefits, Plaintiffs say, the CBAs are irrelevant.  *Id*. at 26.  By contrast, the Defendant argues that such plan documents cannot trump the right to

---

[6]      Although the Plaintiffs argue that "the plan document" controls over a CBA and all other documents, they still refer to multiple plan documents to encompass the various versions of "the plan document" as amended by American over time.  *See supra* Footnote 1.

benefits secured in the CBAs collectively bargained between Plaintiffs and its employees. But

even assuming one considers the CBAs, the parties also disagree whether the Court should

consider only the most recent CBAs or the CBAs that applied at the time of retirement for each

group of employees.

The Plaintiffs' position is premised largely upon the recent Supreme Court decision in

*CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011). Plaintiffs claim that the holding in *Amara*

affirmed that, under ERISA, the plan document ultimately controls whether a plan sponsor (e.g.,

the employer) has promised to vest benefits. *See* Motion at 9. Plaintiffs' reliance on *Amara* is,

however, misplaced here. The district court in *Amara* held that failing to fully and accurately

represent proposed plan changes to plan participants violated ERISA. The district court

reformed the ERISA plan consistent with the representations made to participants in the

summary plan description. The Supreme Court examined whether the district court had the

power to reform the plan, ultimately concluding that it had such equitable power under an

ERISA section different than the one relied upon by the district court. Along the way, however,

the Court concluded that the summary plan documents, "important as they are, provide

communication with beneficiaries *about* the plan, but that their statements do not themselves

constitute the *terms* of the plan for purposes of § 502(a)(1)(B) [of ERISA]." *Id.* at 1878.

In reaching its conclusion, the Court analyzed ERISA's division of responsibility

between a plan sponsor and a plan administrator. On the one hand, a "plan sponsor (e.g., the

employer) . . . creates the basic terms and conditions of the plan, executes a written instrument

containing those terms and conditions, and provides in that instrument 'a procedure' for making

amendments." *Id.* at 1877 (citing relevant ERISA provisions). On the other hand, a "plan's

administrator . . . manages the plan, follows its terms in doing so, and provides the participants

with the summary documents that describe the plan (and modifications) in readily understandable form." *Id.* (citing relevant ERISA provisions). Given these distinctions, the Court saw "no reason to believe that the statute intends to mix the[se] responsibilities by giving the administrator power to set plan terms indirectly by including them in summary plan descriptions." *Id.*

Thus, the *Amara* case did not address the relevance of CBAs in vesting questions. It simply addressed the effect of a summary plan description, a document whose purpose and terms are governed by ERISA. Such summary plan descriptions are quite different from the binding terms of a CBA, a contract negotiated and drafted between employers and their union workers. Indeed, a CBA has more in common with an ERISA plan prepared by a plan sponsor than it does with a summary plan description as both CBAs and ERISA plans are binding instruments whose terms are within the control of the employer. Not surprisingly then, the Second Circuit has looked to CBAs on vesting questions. *See Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976 (2d Cir. 1997); *In re Chateaugay Corp.*, 945 F.2d 1205 (2d Cir. 1991) (considering whether CBA promised vested benefits); *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130 (2d Cir. 1999). In *Multifoods*, labor unions and a group of retirees brought suit alleging that the CBAs between the defendant and the unions prevented the employer from shifting the costs of a benefits plan to retirees. 116 F.3d at 977. After setting forth the legal standard for vesting on summary judgment, the Second Circuit stated that "[w]e will examine the CBAs and the ERISA plan documents in light of this standard." *Id.* at 980. Similarly, the Second Circuit in *Chateaugay* found that retired employees were guaranteed the provision of health benefits for life by looking to the applicable collective bargaining agreement. 945 F.2d at 1210.

Courts in other jurisdictions have also looked to CBAs for the same purpose.  *See Int'l Ass'n of Machinists & Aero. Workers v. Masonite Corp.*, 122 F.3d 228 (5th Cir. 1997); *ALCOA*, 932 F. Supp. 997; *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006) (stating that court must use contract interpretation principles when plan stems from CBA).  In *Masonite*, for example, the Fifth Circuit confronted CBAs that conflicted with the ERISA plan and concluded that a unilaterally-drafted plan document cannot vitiate rights provided for in a bargained-for CBA.  *See Masonite*, 122 F.3d at 233; *see also Halliburton Co. Bens. Comm. v. Graves*, 463 F.3d 360, 378 (5th Cir. (not permitting an employer to unilaterally take away bargained-for retiree benefits that had been negotiated as part of merger agreement).  In the face of this precedent, Plaintiffs cite no case where a court refused to consider a CBA on a vesting question.

Indeed, some language in the Omnibus Plan Documents—which were drafted by Plaintiffs—actually supports the notion that the CBAs are relevant to vesting.  The online versions of the Omnibus Plan Documents provides, for example, that "[i]n the event of a conflict between the provisions of this guide and the provisions contained in any applicable collective bargaining agreement, the collective bargaining agreement shall govern in all cases with respect to employees covered by such agreement."  *See* RC Ex. 44 at 72 ("About this Guide"); RC Ex. 45 at 86; RC Ex. 46 at 87; RC Ex. 47 at 91; RC Ex. 48 at 89; RC Ex. 49 at 101; RC Ex. 50 at 136; RC Ex. 56 at 9, 17.  The benefit guides American distributed to active employees similarly provide, "[i]n the event of a conflict between the Plans' provisions contained in this Guide and the provisions contained in any applicable collective bargaining agreement . . . the collective bargaining agreement . . . shall govern in all cases with respect to employees covered by such agreement."  *See, e.g.,* 2011 Employee Benefits Guide for Pilots, RC Ex. 58 at 6; 2010 Employee

Benefits Guide for Flight Attendants, RC Ex. 63 at 6; 1990 Employee Handbook, RC Ex. 57 at

47; *see also* SAMF ¶ 109.  In the same vein, the Omnibus Plan Documents since 2005 have

advised retirees:  "You have the right to . . . examine . . . all documents governing the Plan,

including insurance contracts, collective bargaining agreements and a copy of the latest annual

report . . . ."  *See* RC Ex. 26 at 212; RC Ex. 27 at 190; RC Ex. 28 at 178; RC Ex. 29 at 176.[7]

And even though ERISA requires that every welfare plan be established and maintained

pursuant to a written instrument, *see* 29 U.S.C. § 1102(a)(1), nothing in ERISA defines anything

as *the* plan document.  ERISA itself recognizes that various documents are relevant to welfare

benefit plans, as evidenced by its requirement to disclose any summary plan descriptions, annual

reports, terminal reports, bargaining agreements, trust agreements, and other contracts under

which the plan is established or operated.  *See* 29 U.S.C. § 1024(b)(4); *see also Eardman v.*

*Bethlehem Steel Corp. Employee Welfare Benefit Plans*, 607 F. Supp. 196, 207 n.13 (W.D.N.Y.

1984) (legislative history of ERISA indicates "Congress' contemplation that an employee benefit

plan could be comprised of more than one document setting forth the rights and obligations of

the participants under such plan.").  Moreover, while the Plaintiffs label the Omnibus Plan

Documents here as *the* plan documents, the Omnibus Plan Documents themselves are not

uniform.  They include documents with different titles, including group insurance plan, retiree

group medical and life booklet, retiree benefits guide and even universal welfare benefit plan

summary plan description.  *See generally* RC Exs. 26–40.[8]  The language in some of these

documents only further muddies the question about how they should be considered, with some

---

[7]      Other language in the Omnibus Plan Documents since 2005 seems to suggest that they are not binding,
stating that "[n]either this Guide nor updated materials are contracts or assurances of compensation, continued
employment or benefits of any kind."  *See* RC Ex. 26 at 6; RC Ex. 27 at 6; RC Ex. 28 at 5; RC Ex. 29 at 3.

[8]      *See* RC Exs. 26–30 ("Benefit Guides"); Retiree Group Medical and Life Booklet 1992, RC Ex. 31 at 4
("This booklet gives you a complete description of the plan and tells you where to get help if you need additional
information.").

language suggesting that the documents are more akin to the summary plan descriptions at issue

in *Amara*.  For example, the Omnibus Plan Documents since 1999 have stated

> This Health & Life Benefits Guide for Retirees ("Guide") contains
> the legal plan documents and the summary plan descriptions . . .
> for the Group Life and Health Benefits Plan for Retirees of
> Participating AMR Corporation Subsidiaries . . . as it pertains to
> retiree medical . . . and life insurance coverages.

*See* RC Ex. 26 at 6; RC Ex. 27 at 6; RC Ex. 28 at 5; RC Ex. 29 at 3; RC Ex. 30 at 41; *see also*

Retiree Group Life and Medical Expense Benefits Plan 1988, RC Ex. 32 at 4 ("This booklet

gives you a clear and understandable description of your life insurance and medical benefits.").

Given the record before the Court on summary judgment, it is exceedingly difficult to decipher

what legal significance should be given to all these documents and, by extension, the statements

contained in them.  This is particularly challenging given that Plaintiffs did not even include in

their summary judgment papers the documents upon which they rely, instead choosing to submit

only a declaration that contains selected and limited snippets from these documents.[9]

For all these reasons, the Court rejects Plaintiffs' argument that the CBAs should not be

considered in assessing whether benefits have vested for the retirees.  So what CBAs should the

Court consider?  On this question, the Court turns to substantive non-bankruptcy law.  While the

Second Circuit does not appear to have addressed this question directly, other courts have

concluded that a retired worker's rights are generally governed by the CBA under which she

retired and the terms of any ERISA plans incorporated therein.  *Alday v. Raytheon Co.*, 693 F.3d

772, 779 (9th Cir. 2012) (citing *Coffin v. Bowater Inc.*, 501 F.3d 80, 97 n.15 (1st Cir. 2007)); *see*

---

[9]      Even with the documents supplied by the Defendant, there remains little explanation or agreement in the
parties' submissions on these issues.  For example, should the Omnibus Plan documents quoted above be considered
both the ERISA plan and the summary plan description?  If that is the case, does that mean that American is both the
plan sponsor and administrator?  If so, that is not clear from the parties' submissions but is suggested by some of the
documents.  *See, e.g.*, RC Ex. 26 at 163 ("The term 'Plan Administrator,' as used in these procedures refers to
American Airlines, Inc., acting in its capacity as plan sponsor and administrator to the Plan described above."); RC
Ex. 32 at 56 ("Plan Administrator/Employer: American Airlines . . . .").  If true, what does this say, if anything,
about how the Court should consider the language in these documents?

*also Senior* v. *NSTAR Elec. & Gas Corp.*, 449 F.3d 206, 219 (1st Cir. 2006).  This conclusion is

consistent with the notion that "[p]arties to a collective bargaining agreement may contract for

benefits that continue beyond the life of the agreement.  Basic principles of contract

interpretation determine whether benefits survive the expiration of an agreement . . . ."  *McCoy v.*

*Meridian Auto. Sys.*, 390 F.3d 417, 422 (6th Cir. 2004) (citations omitted).  While considering

durational language in a set of CBAs, the Sixth Circuit explained:

> [S]omeone who retired after the expiration of a particular CBA
> would not be entitled to the previous benefits, but is rather entitled
> only to those benefits newly negotiated under a new CBA.  Thus,
> the retirement package available to someone contemplating
> retirement will change with the expiration and adoption of CBAs,
> but someone already retired under a particular CBA continues to
> receive the benefits provided therein despite the expiration of the
> agreement itself.

*Yolton*, 435 F.3d at 581.  This result is not surprising when one considers that retirees have left

their bargaining unit and cannot rely on their (former) union to maintain their benefits.  *See id.*;

*see also Bidlack v. Wheelabrator Corp*., 993 F.2d 603, 609 (7th Cir. 1993) (noting that retired

employees do not pay union dues, vote in union elections, or vote in representation elections, for

they are no longer members of the bargaining unit).  For that reason, employees under a CBA

have a real incentive not to leave their retirement benefits alterable based on future negotiations

between their former employer and a union that no longer represents their interests.  *See id.*[10]

---

[10]      Following this logic, the Sixth Circuit applies an inference on questions of vesting.  *See Int'l Union v.*
*Yard-Man*, 716 F.2d 1476 (6th Cir. 2005).  The Sixth Circuit has reasoned that, where the parties contracted for
certain benefits to accrue when retirement status was achieved, there should be an inference that the parties intended
those benefits to continue so long as retiree status was maintained.  *Id.* at 1482.  Some courts are quite critical of this
so-called *Yard-Man* inference.  *See Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1517 (8th Cir. 1988)
(disagreeing with *Yard-Man* to the extent that it recognizes an inference of an intent to vest); *United Paperworkers*
*Int'l Union v. Champion Int'l Corp.*, 908 F.2d 1252, 1261 n.12 (5th Cir. 1990) (finding "no basis in logic or federal
labor policy for such a broad inference"); *Int'l Union, United Auto., Aero. & Agric. Implement Workers of America*
*v. Skinner Engine Co.*, 188 F.3d 130, 140 (3d Cir. 1999) (criticizing inference).  The Sixth Circuit in *Yolton* later
clarified, "All that *Yard-Man* and subsequent cases instruct is that the Court should apply ordinary principles of
contract interpretation."  435 F.3d at 580.  Wherever the courts fall on the use of such an inference, however, they
all agree on one point: that the vesting of benefits is a matter of contract interpretation.  *See, e.g., United*

### B.      The Section 1113 Proceedings Did Not Wipe Out the Retiree Benefits

The Plaintiffs alternatively argue that the Union Retirees have no vested rights under the

CBAs because those CBAs were abrogated.  They rely upon the Section 1113 proceedings in this

bankruptcy where Debtors received authority to reject the APA CBA.  *See In re AMR Corp.*, 477

B.R. 384 (Bankr. S.D.N.Y. 2012); *In re AMR Corp.*, 478 B.R. 599 (Bankr. S.D.N.Y. 2012).  In

those decisions, the Court concluded that significant changes to the APA's CBA were necessary

for the Debtors' reorganization, an economic determination supported by both the Debtors'

business plan and a comparison of the existing CBA's terms with those of Debtors' competitors.

After being granted authority under Section 1113, the Debtors subsequently rejected the APA

CBA while also negotiating new CBAs with the APFA and the TWU.  Given these events, the

Plaintiffs claim that the retirees have no claim to benefits under the CBAs because those CBAs

are no longer in effect.  The Court disagrees.

As Judge Lifland noted in *In re Ionosphere Clubs, Inc.*, 134 B.R. 515 (Bankr. S.D.N.Y.

1991), "[Section] 1114 is the exclusive provision relating to modification or termination of

retiree benefits."  *Id.* at 519.  It is well established that Section 1114 displaced Section 1113 as a

means to address retiree benefits.  *See id.* at 520 (noting that Section 1114 specifically and

unequivocally addresses retiree issues that would otherwise be covered by Section 1113) (citing

*In re Ohio Corrugating Co.*, 115 B.R. 572 (Bankr. N.D. Ohio), *rev'd on other grounds*, *United*

*Steelworkers of Am. v. Ohio Corrugating Co.*, 1991 WL 213850 (N.D. Ohio Mar. 18, 1991); *In*

*re Unimet Corp.*, 842 F.2d 879 (6th Cir. 1988), *cert. denied*, 488 U.S. 828 (1988)).

Section 1114 provides that a debtor may not modify retiree benefits unless it meets a

series of requirements, including but not limited to demonstrating that the modifications are

---

*Paperworkers*, 908 F.2d at 1261 (noting "matter must be determined on a contract-by-contract basis"); *Skinner Engine*, 188 F.3d at 141 (using "traditional rules of contract interpretation").

necessary to permit the reorganization of the debtor. *See* 11 U.S.C. § 1114(f), (g); *see, e.g., In re GMC*, 407 B.R. 463, 509 (Bankr. S.D.N.Y. 2009) (prior to Section 1114 motion, debtor or trustee must make proposal to retirees' representative that provides for modifications necessary to permit reorganization); *In re Horsehead Indus.*, 300 B.R. 573, 588 (Bankr. S.D.N.Y. 2003) (debtor's motion to terminate retiree health benefits under Section 1114 denied for failure to demonstrate that debtor attempted to confer in good faith to reach mutually satisfactory modifications). Section 1114 was enacted by Congress as a response to the termination of retiree benefits during the bankruptcy proceeding of LTV Corporation without notice to any of its 78,000 retirees. *See* S. Rep. No. 100-119 (1987), reprinted in 1988 U.S.C.C.A.N. 683, 683; *see also In re Visteon*, 612 F.3d 210, 216 (3d Cir. 2010). It was Congress' intent in Section 1114 "to insure that debtors did not seek to effect reorganizations 'on the back of retirees' for the benefit of other parties in interest." *Ionosphere*, 134 B.R. at 523.

It is true that the standards for Sections 1113 and 1114 are almost identical. *See In re Northwest Airlines Corp.*, 366 B.R. 270, 272 (Bankr. S.D.N.Y. 2007) ("Section 1114 of the Bankruptcy Code, providing for the modification of retiree benefits, was modeled on [Section] 1113 . . . ."); *Ionosphere*, 134 B.R. at 518; *In re N. Am. Royalties, Inc.*, 276 B.R. 860, 862 (Bankr. E.D. Tenn. 2002) ("Section 1113 imposes essentially the same process as to collective bargaining agreements that [Section] 1114 imposes as to retiree benefits."). But that does not mean that relief under one section automatically entitles a debtor to relief under both. Quite the contrary. Each requires its own showing. Consistent with those requirements, the Section 1113 proceedings in this case were carefully tailored to address a specific issue: whether the Debtors' proposal for a new APA CBA met the Section 1113 standards, including but not limited to whether the proposed changes were necessary for reorganization. *See* 11 U.S.C. § 1113(b). The

Section 1113 proceedings did not seek any relief as to retiree benefits.  Indeed, no proposal was made by Debtors for such relief as required under Section 1114.  *See* 11 U.S.C. § 1114(f).  Thus, no showing was made—or even attempted—as to whether modifications to such retiree benefits would be necessary for reorganization as required by Section 1114.

The Court rejects any notion that the Section 1113 proceedings in this case somehow accomplished the dual purpose of abrogating the CBAs of current union workers while also eliminating any right to benefits for retirees.  Such a result would be grossly unfair to both current and former employees.  It would allow a debtor to double dip on its savings without proving the need for such savings.  An example is helpful to illustrate the problem.  A hypothetical debtor files a Section 1113 motion based on a proposed new CBA that would save the company $10 million.  The debtor presents evidence that its proposal satisfies the requirements of Section 1113, including showing that the $10 million in savings is necessary for reorganization.  Satisfied that the debtor has met its obligations under Section 1113, the court authorizes the rejection of the existing CBA.  The debtor then rejects that CBA.  Separate and apart from the Section 1113 proceedings, the debtor subsequently wishes to eliminate benefits to retirees for a saving of an additional $10 million.  Under Plaintiffs' theory, the hypothetical debtor is allowed to terminate the retiree benefits without any further action simply because the CBA that is the source of those benefits has been rejected under Section 1113.  As a result, the debtor is able to obtain a total savings of $20 million, even though it only demonstrated that $10 million in cost savings was necessary for reorganization.  Such a result is clearly contrary to the plain language of Section 1114.[11]

---

[11]    Proceedings under Sections 1113 and 1114 are often done together, which allows the debtor to set forth its case about the company's financial needs in one proceeding.  *See, e.g., Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors (In re Tower Auto. Inc.)*, 241 F.R.D. 162, 164 (S.D.N.Y. 2006); *Horsehead Indus.*, 300 B.R. at 578.  In such cases, the debtor needs to establish, among other things, that the total savings requested are

Such a result is also problematic for another obvious reason: the retirees had no voice in the Section 1113 proceedings.  While the Court appointed a retiree committee in this case to represent the interests of retired employees—who are no longer represented by their labor organizations—the retiree committee did not participate in the Section 1113 proceedings.[12] Indeed there was no reason for retirees to participate in the Section 1113 proceedings because no relief was requested as to retiree benefits.[13]

By the same token, the Court is not persuaded by the Defendant's claim that the Railway Labor Act somehow guarantees that retiree benefits must continue regardless of whether those benefits have vested or the employer has reserved the right to terminate them.  The Defendant points to no authority establishing that the Railway Labor Act automatically vests retiree benefits, regardless of the terms of the relevant documents, and the Court is aware of none. There is also nothing in this Court's prior opinion in this case on the Railway Labor Act that supports the Defendant's position.  *See In re AMR Corp.,* 471 B.R. 51 (Bankr. S.D.N.Y. 2012).

---

necessary for reorganization.  *See Ionosphere*, 134 B.R. at 523.  In other instances—such as this bankruptcy—a company seeks relief under only one provision while reserving the right to subsequently seek relief under the other if necessary.

[12]      Even if the Section 1113 proceedings could abrogate the retiree benefits under the then current CBA, Plaintiffs provide no authority as to how such a proceeding could modify any retiree benefits that might have vested under prior CBAs.  *See infra* Section C.

[13]      There is some authority that Section 1114 is the exclusive manner for addressing retiree benefits during the pendency of a bankruptcy case, regardless of what the applicable documents might say about the right to terminate those benefits.  *See Visteon*, 612 F.3d 210 (holding a debtor may terminate retiree benefits during the pendency of a bankruptcy case by complying with the terms of Section 1114, regardless of whether the contractual language allows termination outside of bankruptcy); *but see In re Delphi Corp.*, 2009 WL 637315, at *2 (Bankr. S.D.N.Y. Mar. 10, 2009) (holding that a debtor in possession need not comply with the procedures and requirements of Section 1114 if it has the right to terminate or modify benefits unilaterally under the welfare plan in question and non-bankruptcy law).  One might read the protections of the *Visteon* case to be temporal, covering only events during the pending bankruptcy case, after which time the parties' rights would revert back to those prior to the bankruptcy.  But as that the Debtors' plan of reorganization has already been confirmed in this case, the parties have not raised this issue in their briefing and the Court does not need to address it here.

### III.    Language Capable of Reasonable Interpretation as Promise to Vest

Having resolved these threshold issues, the Court turns to whether the relevant

documents here are capable of being interpreted as a promise to vest benefits.  Looking at those

documents, we apply "ordinary principles of contract interpretation" to determine whether

benefits have vested.  *Yolton*, 435 F.3d at 580.  If the controlling documents unambiguously

indicate benefits are vested, that language should be enforced.  *Abbruscato v. Empire Blue Cross

& Blue Shield*, 274 F.3d 90, 97 (2d Cir. 2001) (citing *Multifoods*, 116 F.3d at 980).

To vest means "[t]o give (a person) an immediate, fixed right of present or future

enjoyment."  Black's Law Dictionary (9th ed. 2009).  To vest benefits renders them unalterable

absent the consent of both parties.  *See Sprague v. GMC*, 133 F.3d 388, 400 (6th Cir. 1998).  To

survive summary judgment on a vesting issue, however, an employee need not point to

unambiguous language promising to vest benefits.  *Devlin*, 274 F.3d at 83 (internal alterations

and citations omitted).  It is sufficient to identify language that is reasonably susceptible to

interpretation as a promise to vest benefits.  *See id.* (internal alterations and citations omitted);

*see also Abbruscato*, 274 F.3d at 97; *Joyce*, 171 F.3d at 134.  In this way, the Second Circuit

standard permits a plaintiff to reach a trier of fact based on ambiguous plan language.  *See

Devlin*, 274 F.3d at 83 ("[O]ur standard permits a plaintiff to get to a trier of fact based on

ambiguous plan language," compared to a standard requiring clear and unambiguous language).

But such a binding obligation will not be inferred for summary judgment "absent some language

that itself reasonably supports that interpretation."  *Joyce*, 171 F.3d at 134.

Applying these principles, the Second Circuit has denied summary judgment to an

employer where ambiguous language rendered the vesting issue a disputed fact for trial.  For

example, the Second Circuit found ambiguous language in an early-retirement agreement to be

reasonably susceptible to being interpreted as a promise to vest benefits. *See Abbruscato*, 274 F.3d at 97 ("If you [meet the eligibility requirements], you are eligible for lifetime health insurance and life insurance coverage . . . ."). Similarly, the Second Circuit denied summary judgment where a summary plan description stated life insurance benefits "will remain at [the annual salary level] for the remainder of [the retirees'] lives." *Devlin*, 274 F.3d at 85. The court in *Devlin* found that such so-called "lifetime language" was sufficient to create a triable issue regarding vesting and survive summary judgment. *Id.* The court in *Devlin* also considered a second statement, which provided, "retired employees, after completion of twenty years of full-time permanent service and at least age 55, *will be insured.*" *Id.* at 84 (emphasis in original). The court concluded that this language could be construed as an offer that could be accepted by an employee's full time service for twenty years and reaching the age of 55. As the company did not reserve the right to revoke this offer and the employees had satisfied these conditions, the Second Circuit concluded that the employer's promise could not be revoked. *Id.* at 84–85.

Courts in other jurisdictions have reached similar conclusions that lifetime language is sufficient evidence of intent to vest so as to require a trial. *See Bidlack*, 993 F.2d at 605–08 (allowing case to go to jury based on written language stating that "both you and your spouse will be covered for the remainder of your lives"); *Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410, 414 (E.D. Mich. 1994) (finding strong evidence of intent to vest where summary plan description stated, "all of your [health care] will be continued for the rest of your life without cost to you. Kelsey-Hayes also pays the full cost of [coverage] for surviving spouses and eligible children of deceased pensioners and of employees who die after they are eligible to retire voluntarily under the [plan]."); *Masonite*, 122 F.3d at 232–33 (holding that phrase linking coverage "until the death of the retired employee" could be construed as a limiting or right-granting provision and

23

was therefore ambiguous).  One court even found summary judgment to be inappropriate where

a CBA ambiguously stated that the company "will provide" coverage to retirees, eligible

dependents, and surviving spouses and all benefits "will be provided without cost to retirees."

*ALCOA*, 932 F. Supp. at 1005–06.  The court in *ALCOA* found that "the inclusion of surviving

spouse benefits, in addition to other indicia of intent, is an indication that the parties intended

to vest welfare benefits."  *Id.*

By contrast, the Second Circuit has found agreements unambiguous where the promise of

benefits was limited to a finite term.  In *Chateaugay*, for example, the court considered a CBA

that promised benefits during the term of the agreement and, upon the expiration date of the

CBA, provided that benefits were to be paid by a benefits trust.  *Chateaugay*, 945 F.2d at 1208.

The court in *Chateaugay* held that the CBA provision guaranteeing benefits "during the term of

[the CBA]" established that the promise of employer-paid benefits expired when the CBA term

lapsed.  *See id*.  The Second Circuit considered a similar situation in *Multifoods*, where the CBA

promised benefits that could not be diminished during the term of the agreement.  *See*

*Multifoods*, 116 F.3d at 981.  The court in *Multifoods* held there was no ambiguity regarding

vesting because, as in *Chateaugay*, the promise was limited to the term of the CBA.  *See id.*

While a specific durational limit prevents vesting, however, the mere absence of any limit does

not establish vesting.  The Court cannot infer a promise to vest from silence in the agreement.

*See Joyce*, 171 F.3d at 135 (rejecting contractual vesting argument where document did not

include "language that affirmatively operates to create the promise of vesting.").

But even if a court determines that the applicable agreement contains vesting language, a

court must then examine whether the employer nonetheless reserved the right to modify or

terminate the benefits.  *See Abbruscato*, 274 F.3d 90.  In *Abbruscato*, one document in question

contained both a lifetime promise and a reservation of rights to amend or terminate coverage.  *Id.* at 99.  The court in *Abbruscato* held that, given the reservation of rights, the document was not reasonably susceptible to interpretation as a promise to vest benefits despite its lifetime promise. *Id.*  The court specifically limited its holding to situations where the reservation was contained in the same document as the promise to vest.  *Id.* at 99–100.  The court also concluded that merely reserving *some* right was not sufficient to negate a promise to vest.  It considered vesting language in a second document—an early-retirement program offered by the company.

After determining that the early-retirement agreement contained language reasonably susceptible of being interpreted as a promise to vest benefits, the court in *Abbruscato* turned to a reservation of rights clause.  *Id.* at 97.  That clause provided that the company "reserves the right to amend and/or terminate the VSO *Program* at any time for any purpose.  The Corporation also reserves the right to announce new and different plans and programs as business needs require, although there are no plans to do so at this time."  *Id.* at 97–98 (emphasis in original).  The court found that this provision did not unambiguously reserve the company's right to reduce retirement benefits under the program.  *Id.* at 98.  Rather, because the reservation referred to the "program," the court concluded that the language was capable of being interpreted only as a reservation of the right to change the program for those who had not yet retired under the terms set forth in the agreement.  *Id.*  Accordingly, the Second Circuit vacated the district court's grant of summary judgment to the defendants and remanded for further proceedings.  *Id.*

Consistent with the standards set forth above, the Court now turns to the CBAs, plan documents, and other relevant documents for each group of retirees to determine whether Defendant has identified language that can be reasonably read as a promise to vest benefits and whether any such promise is undermined by a reservation of rights.

### A.     The APA Retirees

The Defendant points to various language in the documents that make up the CBAs as being reasonably susceptible to interpretation as a promise to vest benefits.  The Court agrees that these can be reasonably interpreted as a promise for lifetime benefits.

The Defendant relies most heavily on a 2003 amendment to the CBA, the so called Supplement K(1).  It states:  "[i]t is further agreed that no changes shall be made to the retiree medical plan for retired or disabled pilots."  In deciding whether this language is reasonably susceptible to interpretation as a promise, some context is in order.  Supplement K(1) discusses the agreement between AMR and the APA to generate savings of $10 million and describes certain related negotiated changes to the employee benefits.  Although there is no "lifetime language," the statement that "no changes shall be made" can be reasonably interpreted as a promise to vest benefits.  If American could not change the retiree benefits, this suggests that the benefits will remain in effect indefinitely.  Moreover, there is nothing that ties the promise in Supplement K(1) merely to the duration of the CBA's term, a factor which would undercut a vesting claim.  *See Chateaugay*, 945 F.2d at 1208 (no possible promise of vesting where benefits limited to the term of the CBA); *Multifoods*, 116 F.3d at 981.[14]

The Plaintiffs claim that the statement regarding the retiree medical plan means that no changes could be made to achieve the desired savings, but that changes could be made for any other reason.  But the language does not say that.  *See Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*,

---

[14]     Given this context, the Court is not persuaded by the Plaintiffs' contention that Supplement K(1) was a mere "side letter," and that a change of such importance as vesting benefits would not be relegated to an ancillary document.  *See* Plaintiffs' Reply ("Reply") at 23 (ECF No. 45); *see also Ames Dep't Stores*, 161 B.R. at 89 (court must view facts in light most favorable to non-moving party).  The Plaintiffs' characterization is inconsistent with their statement in the same pleading that the Court must read Supplement K(1) as "part of the entire 2003 pilots' CBA."  Reply at 23.  It is also inconsistent with the position the Debtors took during the Section 1113 proceedings in this bankruptcy.  More specifically, the declaration of American's Vice President of Human Resources, filed in support of Debtors' Section 1113 Motion, cited Supplement K as a provision of the current CBA requiring American to maintain "certain medical plan designs."  Decl. of Carolyn Wright ¶ 22 (Main ECF No. 2041-6).

889 F.2d 1274, 1277 (2d Cir. 1989) (a court is not required to adopt an interpretation that would

"strain[] the contract language beyond its reasonable and ordinary meaning").  Of course,

extrinsic evidence cannot be considered to urge an interpretation that is inconsistent with the

plain meaning of the Supplement K(1) language.  But in any event, such extrinsic evidence about

the meaning of Supplement K(1) is not appropriate for the Court to consider and resolve on

summary judgment.  With only the Plaintiffs' Motion before the Court, the Defendant needs only

identify language reasonably capable of interpretation as a promise to vest benefits to defeat

summary judgment.  The Court concludes that they have done so with Supplement K(1).[15]

        This conclusion is confirmed by language in other pilot agreements.  In 1983, the APA

and American renegotiated the terms of the CBA, with additional terms that were incorporated in

a document entitled Supplement B.  Supplement B provided that American "will take no action,

*at any time*, by way of notice, negotiations or otherwise, to diminish the pay or the retirement

benefit programs in effect on the date hereof for pilots hired prior to November 1, 1983 . . . ."

For the group of pilots hired prior to November 1, 1983, and who retired while this CBA was in

effect, this language suggests that the Plaintiffs may not make any changes to the benefits that

those retired pilots receive.  Such language defeats summary judgment for those retirees.

Relying on language following this quote, the Plaintiffs argue that "pay or retirement benefit

programs" refers only to pension plans, but not welfare benefits.  Reply at 18–19.  The Court is

---

[15]        The Defendant relies most heavily on extrinsic evidence in their arguments, but the Plaintiffs respond with
some of their own.  On the issue of Supplement K(1), the Plaintiffs rely on the testimony of Jeff Brundage, Vice
President of Employee Relations at American in 2003.  *See* Reply at 23–24 ("I believe that sentence means
specifically that for purposes of achieving these savings, we will not touch those benefits . . . .") (ECF No. 45).  The
Defendant seeks to introduce extrinsic evidence to demonstrate Supplement K(1) memorialized the progression of
negotiations, resulting in an agreement that no changes whatsoever could be made to benefits.  *See* Defendant's
Opposition ("Opp.") at 39 (discussing testimony by American's lead negotiator regarding negotiation history) (ECF
No. 30); SAMF ¶¶ 167–73 (citing declarations regarding negotiation process leading up to agreement in Supplement
K(1)).  But this dueling extrinsic evidence about the meaning of Supplement K(1) only further confirms that
summary judgment on this issue is inappropriate.  *See Joyce*, 810 F. Supp. at 73 (denying summary judgment where
"extrinsic evidence presented by both parties demonstrates that there is a genuine issue of fact concerning the intent
to vest retiree benefits").

not convinced. At most, the Plaintiffs have shown that the language is ambiguous, in which case summary judgment is not proper. *See Joyce*, 810 F. Supp. at 73 (denying summary judgment where "extrinsic evidence presented by both parties demonstrates that there is a genuine issue of fact concerning the intent to vest retiree benefits").

The Court's conclusion is further confirmed by other language in the APA's CBAs. Starting in 1967 and continuing to present, the APA CBA has provided that Plaintiffs would "assume the full cost of coverage" under the Plan for retired pilot employees. *See, e.g.,* RC Ex. 81 at 58; RC Ex. 82 at 114; RC Ex. 89 at 146; RC Ex. 93 at 147.[16] It further expressed Plaintiffs' intent "to continue to make available to its retired pilots a Group Insurance Plan of a type similar to that which is now available . . . ." *Id.* This language is not as strong as the lifetime language found to be a promise to vest in *Devlin* and *Abbruscato*. But it also is not the fixed term language found to be lacking in *Multifoods* and *Chateaugay* or the silence found to be insufficient for vesting purposes in *Joyce*.

Taken together, the language identified in the agreements above can be reasonably interpreted as a promise to vest benefits for the APA Retirees at issue in this proceeding.

The Plaintiffs argue that two reservations of rights override any such vesting language. The first statement, found in every APA CBA since 1967, states, "[a]lthough it is the intention of the Company to continue to make available to its retired pilot employees a Group Insurance Plan of the type similar to that which is now available, the Company reserves the right to modify the Plan." *See, e.g.,* RC Ex. 81 at 58; RC Ex. 82 at 114; RC Ex. 89 at 146; RC Ex. 93 at 147.[17] The Plaintiffs, citing *Abbruscato*, argue that this reservation of the right to modify undermines any possible lifetime language in the CBA, including the statement in Supplement K(1). Although

---

[16]    For each CBA, *see* RC Exs. 81–91 at § 30.J.2; RC Exs. 92–93 at § 24.J.2.

[17]    For each CBA, *see* RC Exs. 81–91 at § 30.J.2; RC Exs. 92–93 at § 24.J.2.

the same document—the CBA—contains both the alleged promise and the reservation, this case

is distinct from *Abbruscato*, because it only reserves the right to modify the Plan, not terminate

it.  "Modify . . . connotes moderate change."  *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S.

218, 227 (1994).  Modify is defined as "to change in incidental or subordinate features."

*Territory of Guam v. Ulloa*, 903 F.2d 1283, 1286 (9th Cir. 1990).  To interpret modification to

allow nullification or termination would be an unjustifiable departure from the plain meaning of

the word.  *See id.*  The Plaintiffs can point to no case where an employer prevails based upon a

reservation that only permitted the right to modify.

　　　The Defendant cites several cases that further support the conclusion that the right to

modify here does not include the ability to terminate benefits.  Those cases rely upon the use—or

lack thereof—of these terms in other parts of the same agreement.  *See* Defendant's Surreply at 7

(ECF No. 66) (citing *Nat'l Basketball Ass'n v. Nat'l Basketball Players Ass'n*, 2005 WL 22869,

at *8 (S.D.N.Y. Jan. 3, 2005) (use of different terms in different sections of CBA indicated that

the parties did not intend for the different terms to have same exact meaning); *Int'l Fid. Ins. Co.

v. County of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000) (same).  And in fact, the APA

CBAs use the terms "modify" and "terminate" in different sections, supporting the notion that

the terms have different meanings for the parties to these contracts.  For example, in the 2003

APA CBA, Supplement F(4) provides for the amendment, suspension, or termination of a

pension plan.  *See* Ex. 93 at 198 (Supplement F).  That section also distinguished between the

terms by requiring different actions to accomplish amendment and termination.  *Id.* (requiring

Section 14.2 procedures for amendment, but requiring action by Board of Directors for

suspension or termination).  Supplement X(1) of the same CBA, which covers a profit sharing

bonus arrangement, provides, "Nothing in this Letter of Agreement is intended to limit the

Company's rights under applicable laws to modify, annul or terminate the plan." Ex. 93 at 282–

83 (Supplement X(1) ¶ 7). Another example is found in Letter of Agreement 05-05, which

provides that "upon amendment of the Agreement, [the Corporate Exception] may be terminated

by either party . . . ." Ex. 93 at 468 (LOA 05-05). Having demonstrated their ability to use the

term "terminate" when they felt it appropriate, the Court is not persuaded that the word "modify"

here can reasonably be read on this record to include the right to terminate.[18] *See Nat'l*

*Basketball Ass'n*, 2005 WL 22869, at *8; *see also Int'l Fid. Ins.*, 98 F. Supp. 2d at 412.

        The second reservation of rights that Plaintiffs rely upon is found in the Omnibus Plan

Documents. While the language has changed slightly over the years, in essence it states,

"[a]lthough it is the intention of the Company to continue to make available to its retired pilot

employees a Group Insurance Plan of the type similar to that which is now available, the

Company reserves the right to modify or terminate the Plan." *See, e.g.,* RC Ex. 40 at 25; RC Ex.

31 at 4; RC Ex. 28 at 5. But what should be made of this language if it is inconsistent with CBA

language discussed above that is capable of being interpreted as a promise to vest? The Second

Circuit has not addressed this issue. Other courts that have considered this question have

concluded that, where a plan and CBA conflict, the bargained-for CBA should control over the

employer-drafted plan documents. As the Fifth Circuit explained: "[a] reservation-of-rights

clause in a plan document . . . cannot vitiate contractually vested or bargained-for rights. To

conclude otherwise would allow the company to take away bargained-for rights unilaterally."

*Masonite*, 122 F.3d at 233 (citing *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1297 (6th Cir.

---

[18]        The Plaintiffs stress that they only seek judgment declaring their right to modify benefits, not terminate
them. *See* Motion at 1 (ECF No. 13); Reply at 9 (ECF No. 45). But they have made clear their intention to shift the
entire cost of these benefits from the company to the retirees. As a practical matter, it is difficult to interpret this as
anything other than a proposed termination of the benefits. In any event, the Plaintiffs have requested summary
judgment on the issue of whether the retiree benefits are vested, which would grant them not only the ability to
modify retiree benefits but also to terminate them. *See Masonite*, 122 F.3d at 231–32 (considering whether benefits
survive termination of CBA promising them); *Sprague*, 133 F.3d at 400 (vesting renders benefits unalterable).

1991); *Paperworkers*, 908 F.2d at 1261)); *see also Halliburton*, 463 F.3d at 378; *Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 265 (6th Cir. 2012); *Prater v. Ohio Educ. Assoc.*, 505 F.3d 437, 444 (6th Cir. 2007).

The APA and American negotiated the terms found in the CBA, including the right to modify the plan offered to its retirees.  American drafted the Omnibus Plan Documents, which included a broader reservation of the right to modify and terminate the plan.  On this motion for summary judgment, the Court declines to allow the language in the unilaterally-drafted Omnibus Plan Documents to override the bargained-for language in the CBA.  If extrinsic evidence justifies some other interpretation of the discrepancy in the language, the proper place to resolve such an issue is at trial, not on summary judgment.  *See Joyce*, 810 F. Supp. at 73 (denying summary judgment where "extrinsic evidence presented by both parties demonstrates that there is a genuine issue of fact concerning the intent to vest retiree benefits").

In sum, the Court concludes on this record that the Plaintiffs are not entitled to summary judgment on the question of vesting of APA retiree benefits.

**B.      The APFA Retirees**

In 1995, the parties amended the APFA CBA to include a "me too" clause connecting flight attendant retirement benefits to those of pilots under the APA CBA.  *See* 1995 APFA CBA, RC Ex. 76 at 162 (Article 35) ("The Health Benefit Plan for retirees, other than Article 30 retirees and those flight attendants who elect to take Appendix T, shall be the retiree health benefits plan for pilot employees of American Airlines represented by the [APA].").  The Court has concluded that the APA CBAs contain language reasonably capable of interpretation as a promise to vest benefits, and the APFA flight attendants who retired since 1995 stand in the

same posture as the APA pilots.  Accordingly, summary judgment is not proper with respect to these APFA retirees.

The remaining APFA retirees fall into two camps:  flight attendants who retired under the early retirement options set forth in Article 30 of the APFA CBAs and flight attendants who retired prior to 1995.

As to the first group, Article 30 describes the retirement benefits available to flight attendants who chose early retirement.  From 1979 to 1987, Article 30 remained substantially the same.  *See* RC Ex. 73 at 120 (Article 30.A.2.b(1)); RC Ex. 74 at 132 (Article 30.A.2.b(1)); RC Ex. 75 at 159 (Article 30.A.5(b)(1)).  Article 30 provides that flight attendants are eligible for early retirement after turning 45, but before reaching 55, if they have 20 years of company seniority.  *See, e.g.,* RC Ex. 73 at 119.  Article 30 states that early retirees "shall each be insured under the Retired Employee Major Medical Plan for $20,000 until the Flight Attendant reaches age 65 and/or is eligible for Medicare."  *Id.* at 120.  After reaching age 65, eligible flight attendants are "each covered by the unused balance, if any, of the $20,000 . . . Such coverage shall cease upon the death of the retired flight attendant, or when his/her surviving spouse is eligible for coverage under Medicare, if later."  *Id.*[19]  Much like in *Devlin*, this language suggests that the Plaintiffs promised lifetime health benefits upon performance—at least up to a monetary cap—and there is no reservation of the power to revoke this offer.  This conclusion is buttressed by the fact that health benefit coverage is linked to the death of the retiree, similar to the language in *Masonite*, and that the CBA also provides for surviving spouse health benefits until Medicare coverage is available.  *See ALCOA*, 932 F. Supp. at 1006 ("[T]he inclusion of surviving spouse benefits, in addition to other indicia of intent, is an indication that the parties

---

[19]     The Plaintiffs attempt to distinguish the language here—"coverage shall cease upon death"—from the phrase "until death" in *Masonite*.  They claim that "upon death" simply signifies the latest point by which an APFA retiree's benefits must cease.  Reply at 26.  The Court does not find this distinction persuasive.

intended to vest welfare benefits."); *see also Golden*, 845 F. Supp. at 413.  Taken together, these statements in Article 30 are capable of interpretation as a promise to vest medical benefits to these flight attendants who opted for early retirement.[20]

Similarly, Article 30 contains language that appears to promise vested life insurance benefits to retirees.  For a flight attendant hired on or after May 27, 1974, that employee on early retirement "shall be insured for $5,000 of term life insurance as a retired employee."  *See, e.g.,* RC Ex. 76 at 140 (Article 30(A)(5)(a)).  For flight attendants hired prior to May 27, 1974, the term life insurance was determined by the year of retirement.  For example, in year one of retirement, the retiree was insured for $30,000.  *Id.* at 141.  For "year six and thereafter" the retiree was insured for $5,000.  *Id.*  Just as with the medical benefits, the promise of these benefits was conditioned on performance of twenty years of service, and there is no provision to revoke this benefit once it had been accepted by performance.  *See Devlin*, 274 F.3d at 82.  Again, the use of the phrases "shall be insured . . . as a retired employee" and "year six and thereafter" suggest that the promised coverage was ongoing.  Therefore, Defendant has also identified language reasonably capable of promising life insurance for flight attendant early retirees.

Turning to the second group—flight attendants who opted for regular retirement prior to 1995—the Defendant cites Article 35 of the CBAs as a promise of lifetime benefits.  Article 35

---

[20]     The Plaintiffs claim that "listing 'death' as a termination event does not vest lifetime benefits."  *See* Reply at 17 (citing *Bouboulis v. Transp. Workers Union*, 442 F.3d 55, 61 (2d Cir. 2006); *Joyce*, 171 F.3d at 134).  However, the Plaintiffs' reliance on these two cases here is misplaced.  Both of those cases looked at documents containing only this "death" language.  *Bouboulis*, 442 F.2d at 60–61; *Joyce*, 171 F.3d at 134.  The court in *Bouboulis* found that the document in question lacked any affirmative "lifetime language" resembling the language found in *Devlin*.  *Bouboulis*, 442 F.2d at 60–61 (citing *Devlin*, 274 F.3d at 84–85).  Instead, the only language relied on was a statement listing two circumstances under which benefits may be terminated—ceasing employment and death.  *Id.*  Because they were no longer employed, the retirees argued that death was the only remaining cause for termination and that it was reasonable to infer from that a promise of lifetime benefits.  *Id.* at 61.  The court in *Bouboulis* rejected that argument, and the Plaintiffs urge the same result here.  But unlike *Bouboulis*, the APFA CBAs do more than simply list death as a termination event.  Accordingly, the holding in *Bouboulis* is not directly applicable for this particular discussion.

33

describes medical benefits for flight attendants and sets forth lifetime maximums.  *See, e.g.,* RC Ex. 73 at 134 (Article 35.A) ("Life Insurance: For an employee whose base salary is $1,500 or over, his/her basic coverage shall be two times his/her basic annual salary . . . ."); *see id.* (Article 35.B) ("$100,000 will be added to the Major Medical Expenses Benefits Lifetime Maximum of each employee and his/her eligible dependents, increasing it from $200,000 to $300,000.").

The Defendant relies primarily on these descriptions of lifetime maximum benefits in Article 35 to support its contention that retiree benefits are vested.  The Plaintiffs argue that reference to a lifetime maximum is insufficient.  None of the cases that the Plaintiffs cite for that proposition are from the Second Circuit, and all but one case deal with vesting in different contexts.[21]  The remaining case the Plaintiffs cite is *Rexam Inc. v. United Steel Workers of Am.*, 2006 WL 2530384 (D. Minn. Aug. 31, 2006).  On reconsideration of an employer's motion for summary judgment, the court in *Rexam* found that a lifetime ceiling did not establish vesting.  *Id.* at *18.  However, the court considered the question using the Eighth Circuit summary judgment standard for vesting, which differs from that in the Second Circuit.  There the burden falls on the employee to demonstrate a "clear" intent to vest health benefits.  *Id.* at *9.  The Eighth Circuit further requires, "in order for health benefits to be vested, not only must the employer agree  in a CBA or elsewhere to vest those benefits, but that agreement 'must be incorporated, in some fashion, into the formal written plan.'"  *Rexam*, 2006 WL 2530384, at *3 (quoting *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 949 (8th Cir. 1994)).  Given these high hurdles, the court in *Rexam* found not only that the CBAs lacked clear vesting language, but also that the agreements showed

---

[21]    In one case, *Meadows v. Cagle's, Inc.*, 954 F.2d 686 (11th Cir. 1991), an employee claimed benefits vested upon injury.  On a similar note, in *Babikian v. Paul Revere Life Ins., Co.*, 63 F.3d 837 (9th Cir. 1995), a terminated employee claimed that she was entitled to the lifetime maximum because it had vested upon injury while she was still employed.  Both of these cases are distinct from the instant one, which involves vesting upon retirement.  The Plaintiffs also cite to *Local Lodge 470 v. PPG Indus., Inc.*, 2006 WL 901927, at *11 (W.D. Pa. Mar. 31, 2006), which does not appear to discuss lifetime maximums at all.

a *lack* of intent to vest because they contained provisions limiting the duration of the retiree

medical benefits, much like those in *Multifoods* and *Chateaugay*.  *Id.* at *10.

Here, the pre-1995 CBAs indicate the lifetime maximum.  The Court agrees with the

Plaintiffs that a lifetime maximum is not the same as the "lifetime language" described in much

of the applicable case law.  But that does not end the inquiry because this language must be read

in context with the rest of the agreement.  Article 30 refers to the Retired Employee Major

Medical Plan, and provides for benefits once an early retiree reaches the standard retirement age.

*See, e.g.,* RC Ex. 73 at 119.  This suggests that standard retirement benefits were provided as

well, rather than distinct benefits for early retirees.  Neither party has pointed to a definition of

this term "Retired Employee Major Medical Plan" in the CBA, and upon review, the Court did

not find one.  Still, it would seem an anomalous result to promise early retirees vested benefits

and not offer any medical or life insurance to standard retirees.  In this context, there is

ambiguity regarding benefits for these pre-1995 retirees.  *Devlin*, 274 F.3d at 83 ("Our standard

permits a plaintiff to get to a trier of fact based on ambiguous plan language.").

Finally, there is a 2007 settlement agreement between the APFA and American (the

"2007 APFA Settlement") that appears to preserve the rights of retirees under the Retiree

Standard Medical Plan.  As part of the 2007 APFA Settlement, the APFA agreed to withdraw a

grievance against American.  In turn American agreed "that no changes will be made to the

Retiree Standard Medical Plan for eligible retired or disabled Flight Attendants unless such

changes are also made for the retirees of other unionized workgroups, are administrative in

nature, or are required by law . . . ."  Settlement Agreement, Ex. L to Declaration of Jeffrey B.

Bott, RC Ex. 12 at 690.  It is unclear on this record exactly which retirees fall under the Retiree

Standard Medical Plan, but it might logically include the pre-1995 retirees, the post-1995

retirees, and perhaps even some of the prefunding retirees.  Given the Court's conclusion on

vesting as to other unionized work groups, there is a factual issue regarding the scope of this

language for the purpose of vesting.

Given all the issues identified above, the Court determines on this record that the

Plaintiffs are not entitled to summary judgment on the question of vesting of benefits for APFA

retirees.

###    C.        The TWU Retirees

The TWU represents various work groups and has negotiated CBAs with American for

each work group.  The language in each of these CBAs is substantially similar.  Because the

language was consistent across work groups, the parties discussed the CBA language for all

groups in general and noted any applicable differences.  The Court shall do the same.

The Defendant highlights several aspects of this CBA language to support its argument

that the CBAs promise vested benefits.  From the beginning, the TWU CBAs provided that the

Plaintiffs would assume the full cost of coverage and set forth lifetime maximums.  A 1969

benefit letter, which was incorporated into the TWU CBAs, stated that the Plaintiffs would

assume the full cost of coverage of eligible retired employees' life insurance coverage.  *See, e.g.,*

RC Ex. 95 at 29.  It further stated that eligible retired employees and their spouses "will be

insured at Company expense under a Comprehensive Medical Expense Benefits Policy providing

a lifetime maximum of $20,000." *Id.*  The only reservation made is that the Plan would be

subject to coordination of benefits.  The 1971 TWU CBAs contained an appended letter with the

same provisions. *See, e.g.,* RC Ex. 98 at 29.  In 1974, the benefit letter included as part of the

CBA provided that, for an employee retiring with at least ten years of participation in the Health

Benefits Plan, the maximum medical benefit

36

> shall be $50,000 until the retired employee has reached age 65 and/or
> is covered by Medicare.  Thereafter, the maximum is reduced to
> $20,000.  The surviving spouse of a deceased retired employee will
> continue to be covered . . . to a maximum of $20,000 after the retired
> employee's death, until the spouse is eligible for coverage under
> Medicare, at which time the coverage will cease.

*See, e.g.,* RC Ex. 103 at 70–71.

Future amendments to the CBA altered the amount of the lifetime maximum benefit, but the rest of the language remained substantially the same since 1974.  *See* Opp. at 52–53 (citing SAMF ¶¶ 328, 343–447); *see, e.g.,* 1989 TWU Dispatchers CBA, RC Ex. 121 at 47 ("[R]etired employee . . . covered for $50,000 under the Retired Employee Major Medical Expense Benefits Plan.").  Finally, in 1989, the parties introduced prefunding to the TWU CBAs.  *See, e.g.,* RC Ex. 121 at 36.  In exchange for monthly prefunding contributions from employees, American promised "[r]etiree health coverage . . . will commence after the employee retires."  *Id.* at 37.  The TWU CBAs since then have remained substantially similar with respect to the retiree benefits provisions.  *See* Opp. at 53 (citing SAMF ¶¶ 343–447); *see generally* RC Exs. 127–150.

This language is reasonably capable of interpretation as a promise of vested benefits.  It is similar to the language found sufficient for vesting in *Devlin*, where the court found that the provision was a unilateral offer specifying performance.  *Devlin*, 274 F.3d at 82.  Like *Devlin*, the CBA here conditions entitlement to benefits on certain requirements: ten years of participation in the company health plan, and reaching certain ages or eligibility for Medicare.  As in *Masonite*, the provision of surviving spouse benefits is further evidence of intent to vest retiree benefits.  *Masonite*, 122 F.3d at 232–33.  Given all these provisions, the Court is satisfied that the Defendant has identified language reasonably capable of interpretation as a promise to vest benefits.

The Court next turns to the reservation of rights, which is basically the same as the one in the APA CBAs.  The TWU reservation is found in the CBAs and states:  "[a]lthough it is the intention of American Airlines, Inc., to continue to make available to its employees a Group Insurance Plan of a type similar to that which is now available, the Company will reserve the right to modify the Plan."  *See, e.g.,* 1989 TWU Mechanics CBA, RC Ex. 125 at 59; 2001 TWU Aviation Maintenance CBA, RC Ex. 144 at 94.  For the same reasons discussed above with respect to the APA, the Court finds this insufficient to reserve the Plaintiffs' right to end their contributions to the retiree benefits.  Moreover, the TWU CBAs were amended in 2001 and 2003 to include Article 41, which set forth prefunding requirements and provided that the Company could "modify the Plan consistent with this Article."  Thus, the 2001 and 2003 amendments specifically subject any plan modifications to the terms of the CBA.

For these reasons, the Court determines on this record that the Plaintiffs are not entitled to summary judgment on the question of vesting benefits for the TWU retirees.

### D.        The Early Out Retirees

At various times, American offered certain groups of employees the option to retire early:  the 1987 Programs, the 1994 and 1995 Non-Union Early Retirement Programs, the 1995 TWU Programs, and the 1995 Flight Attendant Program.  In each of these programs, American promised certain benefits in exchange for retiring early.  The program offers were detailed in booklets or guides that are similar in appearance to the Omnibus Plan Documents.  *See, e.g.,* RC Exs. 223, 230.[22]  All of these early retirement offers stated that, if the employee had prefunded,

---

[22]        The Second Circuit held in *Schonholz* that "most, but not all, employer undertakings or obligations to pay severance benefits" fall under ERISA's definition of "employee welfare benefit plan."  *Schonholz,* 87 F.3d at 75.  In deciding whether ERISA applies, courts consider factors such as whether "a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits."  *Id.* at 76.  Based on the record before the Court, the early out retiree agreements appear to qualify as welfare benefit plans under ERISA.

he or she would be eligible for coverage under the Retiree Medical Plan.[23]   The Plaintiffs do not

dispute whether the language is reasonably capable of interpretation as a promise to vest

benefits, but rather focus only on the reservations of rights language in each document.  *See*

Reply at 32–35.  These reservations fall into three categories: a reservation that also contains

language similar to the APFA "me too" clause; a reservation that references rights in other

documents; and a reservation that incorporates rights from another retiree benefit plan.  For the

reasons explained below, the Court is not persuaded on this record that any of this reservation

language is sufficient to permit the Plaintiffs to terminate the benefits offered under these early

out agreements.

The 1987 Programs[24] and the 1994 and 1995 Non-Union Early Retirement Programs all

contain a reservation similar to the "me too" clause found in the APFA CBA.  These programs

provide:

> Retiree group life and medical expense benefits and travel
> privileges provided under this program will continue to the extent
> we provide them to other retirees of the Company.  While we
> expect to continue these benefits and privileges, the Company has
> the right to modify or terminate retiree benefits and privileges at
> any time.

RC Ex. 268 at 4; RC Ex. 223 at 12; RC Ex. 224 at 14; RC Ex. 225 at 10.  With this language, the

retirees under these programs stand in the same posture as the "other retirees."  The Plaintiffs

---

[23]    *See, e.g.,* RC Ex. 230 at 17 ("If you have been prefunding since first eligible, retiree medical coverage will
continue for your lifetime."); RC Ex. 223 at 19 (same); RC Ex. 225 at 5 ("By accepting the Program, you will . . .
[h]ave Retiree Status when you leave the Company.  Retiree Status qualifies you for retiree medical coverage (if you
have prefunded), retiree life insurance and retiree travel privileges immediately upon termination.").

[24]    In 1987, American offered certain employees three early retirement programs.  Two of these provided that
retirees under that program "will receive retirement group life and medical expense benefits for life."  RC Ex. 268 at
3.  The third option, available only to employees under the age of 50 and having at least 10 qualifying years under
the pension plan, stated, "you will receive neither retiree group life nor medical expense benefits.  However, you
may purchase continuation of active medical coverage for up to 18 months."  RC Ex. 268 at 4.  It is not clear if there
are any retirees who selected this third option.  In any event, the parties have not addressed this third option on
summary judgment, but it appears clear that there is no language that could reasonably be read as a promise to vest
under this third option.

even concede that "individuals who took advantage of the 1987 program will get no greater or less protection than normal retirees."  Reply at 34.[25]  It is not entirely clear to which "other retirees" this provision refers, but the Court has found that, on this record, the Plaintiffs have not established their right to terminate their contributions to retiree benefits for the vast majority of retirees.  As such, this conditional reservation is insufficient on this record to entitle the Plaintiffs to summary judgment with respect to retirees under the two 1987 Programs and the 1994 and 1995 Non-Union Early Retirement Programs.

The reservation in the 1995 TWU Early Out Programs also fails to provide the relief the Plaintiffs seek.  It ties the ability to terminate benefits to provisions of other documents.  The 1995 TWU Early Out Programs provide:

> The retiree group life and medical coverage provided to participants will be in accordance with the negotiated terms of the AA – TWU agreement, as it may be amended from time to time . . . While we expect to continue these benefits and privileges, the Company has . . . the right to alter, amend, modify or terminate those plan provisions which are not specified in the AA – TWU agreement; and the right to negotiate for changes in the plan provisions which are covered by the AA – TWU agreement in accordance with the Railway Labor Act, including the benefits and privileges of participants under this program.

*See* RC Ex. 230 at 11; RC Ex. 231 at 12.  It is unclear what the "AA – TWU agreement" is and what it provides, much less how it informs the Plaintiffs' ability to amend or terminate benefits here.  On this record, the Court finds that this reservation is insufficient to establish that Plaintiffs' may terminate their contributions to retiree benefits for retirees under the 1995 TWU Early Out Programs.[26]

---

[25]     The Plaintiffs do not address the 1994 and 1995 Non-Union Early Retirement Programs, but given that they contain the same provision, the same logic should apply.

[26]     The Plaintiffs point to another reservation in the same document in further support of their argument.  *See* RC Ex. 230 at 19 ("The Company hopes and expects to continue this plan indefinitely.  However, the Company does

Finally, the Plaintiffs argue that the 1995 APFA Special Voluntary Early Out Program (the "SVEOP") contains an unambiguous reservation because it incorporates the provisions of another plan, in this case the Retiree Group Life and Medical Plan. *See* RC Ex. 180 at 24 ("Except as may be amended by this Program, the Flight Attendant Pension Plan, the Retiree Group Life and Medical Plan and AA Travel Regulations, as they may be amended, govern and are incorporated by reference."). The Plaintiffs state that the Omnibus Plan Document in place at the time contained a reservation of rights to "modify, suspend or terminate the plan." *See* Reply at 35–36. The Plaintiffs further assert that this incorporation, accomplished in a question-and-answer section of the SVEOP, is an unambiguous reservation of rights that warrants summary judgment.

But the Court is in no position to make such a ruling at this time. As a threshold matter, the Plaintiffs presented this information and argument only in their Reply. *See Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (court need not consider arguments raised for the first time in reply brief); *see also Unsecured Claims Estate Representative of Teligent, Inc. v. Cigna Healthcare, Inc.* (*In re Teligent, Inc.*), 326 B.R. 219, 229 (S.D.N.Y. 2005). In any event, the Plaintiffs make no reference to the other documents incorporated into this provision and fail to explain how all of those should be harmonized. "When evidence is incomplete or disputed, the matter should not be disposed of summarily, but instead should be left for determination by the trier of fact." *Choate v. Landis Tool Co.*, 486 F. Supp. 774, 775 (E.D. Mich. 1980); *see also Delzotti v. Facstore, Inc.* (*In re Facstore, Inc.*), 2007 WL 2245824, at *9 (Bankr. D.N.J. July 31, 2007). Given this incomplete factual record regarding the scope of this reservation, summary judgment is not appropriate on this issue at this time.

---

reserve the right to modify, suspend or terminate the plan at any time."); RC Ex. 231 at 20 (same). This second reservation, however, does not shed any light on the meaning of the initial conditional reservation.

E.      The Prefunding Retirees

The Defendant contends that any retirees who prefunded have vested benefits.  There are three types of employees who have prefunded:  APFA prefunding retirees, TWU prefunding retirees, and non-union retirees.  Given the Court's earlier conclusion that summary judgment is inappropriate with respect to the APFA and TWU retirees based on language in the applicable CBAs, there is no need to reach these alternative arguments regarding those retirees' prefunding agreements.  This leaves the Court to address only the non-union retirees who prefunded.

The Defendant argues that these non-union retiree benefits are vested under the trust agreement for non-union retirees' prefunding contributions (the "Trust Agreement").  The Trust Agreement provides that, "[e]mployer matching contributions and attributable investment earnings shall be reserved exclusively for the payment of Retired Participants' medical and disability benefits as described in the Plan . . . ."  RC Ex. 222 at 10.  The Defendant maintains that this statement prevents the Plaintiffs from terminating retiree benefits for the non-union prefunding retirees until the trust funds have been exhausted.  The same Trust Agreement, however, contemplates termination: "This Trust Agreement and the Trust created hereby may be terminated at any time by the Company . . . In the event of termination of the Trust, Retired Participants will receive the value of their own employee contributions less amounts previously drawn . . . ."  RC Ex. 222 at 27.  As this reservation of the right to terminate is contained in the same document that contains the purported vesting language, this situation is squarely covered by the Second Circuit's holding in *Abbruscato*.  274 F.3d at 99.  Applying *Abbruscato* here, the language relied upon by the Defendant cannot vest benefits given the clear reservation of the right to terminate.  As neither party has identified any other operative document or language, the

42

Court concludes that the Plaintiffs are entitled to summary judgment as to these non-union

prefunded retiree benefits.

### F.      Retirees Covered by Other Miscellaneous Documents

The Defendant argues that certain Omnibus Plan Documents issued in the 1960s and

1980s vested benefits because they lack any reservation of rights.  The documents at issue

include Omnibus Plan Documents from 1962, 1965, and 1969.  *See* RC Exs. 38–40.  It also

covers plan documents issued for individual work groups in the 1980s, including a 1980 Non-

Union Plan Document and the 1982 TWU Plan Document.  *See* RC Exs. 36 and 35.  Given that

the Court has already concluded that summary judgment is inappropriate with respect to the

Union Retirees based on the applicable CBAs, the Court need not now address whether the

1960s and 1980s Omnibus Plan Documents provide an alternative basis to vest benefits for these

Union Retirees.

The Court now turns to the remaining group of Non-Union Retirees.  The Defendant

argues that the 1960s Omnibus Plan Documents vest benefits by virtue of "lifetime language"

found in two places.  The first is a reference to a lifetime maximum benefit.  *See, e.g.,* RC Ex. 38

at 28.[27]  The second, found in the 1969 Omnibus Plan Document, is a chart detailing the level of

life insurance, with one column labeled "6th Year & Thereafter."  RC Ex. 38 at 29.  The

Defendant claims these statements are "nearly identical" to the language "for the rest of your

life" found in the case, *Berg v. Blue Cross & Blue Shield*, 105 F. Supp. 2d 121, 127–29

(E.D.N.Y. 2000); *see also* Opp. at 75.  The language here, however, is not nearly as strong as the

language found in *Berg*.  Moreover, the 1960s Omnibus Plan Documents each included a

---

[27]      The 1962 and 1965 Omnibus Plan Documents reference a lifetime maximum benefit in a section about
active employees.  *See* RC Ex. 40 at 10–11; RC Ex. 39 at 14.  The section for retiree coverage details how a retiree
could elect to reduce life insurance coverage in exchange for "Comprehensive Medical Expense Benefits."  RC Ex.
40 at 29; RC Ex. 39 at 43.

reservation of rights that provided, "The Company expects to continue this Plan indefinitely, but necessarily must reserve the right to modify or cancel it at any time."  RC Ex. 40 at 25; RC Ex. 39 at 12; RC Ex. 38 at 10.  The Defendant does not identify any other document that might support a vesting claim for the Non-Union Retirees.  Thus, the 1960s Omnibus Plan Documents fall squarely within *Abbruscato's* conclusion that, "[b]ecause the same document that potentially provided the 'lifetime' benefits also clearly informed employees that these benefits were subject to modification, we conclude that the language . . . is not susceptible to an interpretation that promises vested [benefits]."  *Abbruscato*, 274 F.3d at 99.[28]  For that reason, the Court finds that the 1962, 1965, and 1969 Omnibus Plan Documents cannot be construed to vest retiree benefits for Non-Union Retirees.

The 1980 Non-Union Plan Document, on the other hand, contains language reasonably capable of interpretation as a promise to vest benefits and does not contain any reservation of rights.  *See generally* RC Ex. 36.  The 1980 Non-Union Plan Document provided that retirees were eligible for coverage if they had completed at least ten years of membership under the plan and met one of two other conditions (regarding age or disability benefits).  RC Ex. 36 at 9.  It also set forth lifetime maximum benefits.  *Id*. at 19.  The 1980 Non-Union Plan Document further provided that "Medical Expense Benefits for the spouse of a deceased retired employee will be continued by the Company until the spouse is eligible for Medicare."  *Id.* at 17.  These statements are very similar to those found in Article 30 pertaining to APFA Retirees and require the same result.  The language here, much like that in *Devlin*, suggests that the Plaintiffs promised lifetime health benefits upon performance.  The provision for surviving spouse benefits is further indicia of intent to vest benefits.  *See ALCOA*, 932 F. Supp. at 1006; *Golden*, 845 F.

---

[28]   The Defendant also argues that the 1960s Omnibus Plan Documents constitute offers that were accepted by performance as seen in *Devlin*.  This argument also fails because the same document containing the offer reserved American's right to reserve.  *See Devlin*, 274 F.3d at 84–85 (finding offer where employer was not free to revoke).

44

Supp. at 413.  Taken together, these statements are reasonably capable of interpretation as a

promise to vest benefits for retirees that fall under the 1980 Non-Union Plan Document.

### G.    The TWA Retirees

In support of their claim that the TWA retirees have no vested benefits, the Plaintiffs rely

upon three plan documents from 2001, 2002, and 2010 that each contain language reserving

American's right to amend, modify or terminate the TWA retiree benefits.  *See* RC Exs. 41–43.

In response, the Defendant cites to documents memorializing American's purchase of TWA's

assets in the TWA bankruptcy case.  These documents include the TWA Purchase Agreement, a

court order approving the sale, and the Section 1114 Agreement that made clear American was

assuming the obligation to provide retiree benefits that TWA was rejecting.  The Defendant

claims that these documents, all before the TWA bankruptcy court, constitute an enforceable

promise that American would make good on its assumption of $644.9 million in liabilities to

these TWA retirees.  For reasons stated below, the Court concludes that there are material

questions of fact about the potential application of judicial estoppel that preclude summary

judgment for Plaintiffs as to the TWA retirees.

As the Second Circuit recently observed, the doctrine of judicial estoppel is not reducible

to any general formulation of principle or exact criteria.  *Adelphia Recovery Trust v. Goldman,

Sachs & Co.*, 2014 WL 1327864, at *4 (2d Cir. Apr. 4, 2014).  However, several factors inform

the decision whether to apply the doctrine in a particular case.  *Id.*  As the Supreme Court in *New

Hampshire v. Maine*, 532 U.S. 742 (2001), explained

> First, a party's later position must be clearly inconsistent with its
> earlier position.  Second, courts regularly inquire whether the party
> has succeeded in persuading a court to accept that party's earlier
> position, so that judicial acceptance of an inconsistent position in a
> later proceeding would create the perception that either the first or
> the second court was misled . . . A third consideration is whether

> the party seeking to assert an inconsistent position would derive an
> unfair advantage or impose an unfair detriment on the opposing
> party if not estopped.

*Id.* at 750–51.

In its recent decision in *Adelphia*, the Second Circuit emphasized that application of the doctrine of judicial estoppel can be invoked to protect the integrity of the bankruptcy process by preventing parties from altering their positions as their litigation needs change. *Adelphia*, 2014 WL 1327864, at \*7 (judicial estoppel can prevent parties from "alter[ing] their positions as to ownership of assets as they deem their litigation needs to change . . . and inject[ing] an unacceptable level of uncertainty into [the bankruptcy process'] results . . . .").

There is no dispute that the TWA Purchase Agreement provided that American would assume and fully satisfy all liabilities listed in the Agreement, which included the $644.9 million in benefits to the TWA retirees.  The TWA Purchase Agreement provided in relevant part:

> As of the Closing, Purchaser [American] **shall assume and thereafter in due course pay and fully satisfy** the following liabilities and obligations of Seller [TWA and its direct and indirect subsidiaries] (the "Assumed Liabilities") and no other liabilities or obligations . . . (c) all liabilities and obligations of any Seller arising at any time under the indebtedness and other liabilities of Sellers listed on Schedule 3.1(c).

RC Ex. 25 at 174–75 (Ex. K Article VIII, ¶ 3.1(c)) (emphasis added).  Schedule 3.1(c) listed the TWA retiree benefits as an assumed liability.  RC Ex. 192 at 77.[29]  American's assumption of such retiree liabilities was clearly important to the transaction.  The assumption of these liabilities is addressed in the order approving the sale:

---

[29]    The TWA Purchase Agreement also contained a provision, entitled Article X, requiring American to provide TWA retirees with employment and retirement benefits "at levels substantially no less favorable than those benefits provided to [American's] similarly situated employees."  RC Ex. 25 at 3 (Stip. ¶ 12); *id.* at 216 (Ex. K, thereto, Article X).  Given the Court's ruling today on vesting as to the Plaintiffs' other employees, Article X is another significant impediment to summary judgment for the Plaintiffs as to the TWA retirees.

46

> Purchaser has not assumed or otherwise become obligated for any of
> Sellers' liabilities **other than as set forth in Section 3.1 of the
> Agreement**, and Purchaser has not purchased any of the Excluded
> Assets.  Consequently, all holders of Retained Liabilities against the
> Sellers are hereby enjoined from asserting or prosecuting any Claim
> or cause of action against Purchaser or the Purchased Assets to
> recover on account of any liabilities **other than Assumed Liabilities
> pursuant to Section 3.1 of the Agreement** . . . .

RC Ex. 199 at 10 (Order ¶ 14) (emphasis added).  As established at the hearing before the TWA

bankruptcy court, the assumption of these retiree liabilities was approximately ten percent of the

purchase price.  *See* RC Ex. 191 at 27–34 (retiree liability of approximately $509 million out of

total consideration of $5.072 billion).  Against the backdrop of this assumption of these

significant liabilities, the sale order concluded that the sale was in the estate's best interest.  RC

Ex. 199 at 4 (Order ¶ F).  The sale order further found that American had offered "fair

consideration" for the TWA assets.  *Id.* at 8 (Order ¶ 7).

In this context, the TWA court approved a Section 1114 motion to substitute American's

assumption of liability for retiree benefits for that of TWA.  That order included as an exhibit a

letter from American to TWA stating, among other things, that American "assumed a stated

amount of liability . . . under the [TWA Purchase Agreement]."  RC Ex. 206 at 6.  The TWA

bankruptcy court ordered, and American provided, a calculation of the dollar amount and a

description of the benefits that American would provide to the TWA Retirees.  In that

calculation, American represented that it would provide benefits to the TWA Retirees with a

value of $644.9 million.  *See* RC Ex. 17 at 30; RC Ex. 211 at 4 n.4.

The Plaintiffs now appear to disavow these representations about the commitment to pay

these benefits.  The Plaintiffs' briefing, for example, labels these liabilities as "contingent."

Reply at 43.  But the Plaintiffs fail to explain what the contingency was.  They also fail to

identify anything in the TWA Purchase Agreement, or the court order approving it, that suggests

the liability was contingent.  As best as the Court can determine, the Plaintiffs contend that

American only had to book the liability and provide coverage for the TWA Retirees for some

indefinite period of time.  Reply at 43–44 (characterizing the obligation as one to estimate costs

for accounting purposes, rather than to pay benefits in any particular amount).  But under this

logic, American never had an obligation to pay any of these retiree benefits at any time, and

instead merely was required to provide an estimate of an apparently non-binding obligation.  The

Plaintiffs' view conveniently ignores the statement in the contract that it assumed or was

"otherwise obligated" to pay the liabilities identified on Section 3.1, which included the TWA

retiree benefits.  The Court refuses to adopt such a nonsensical reading of American's

obligations.  Indeed, it is hard to believe that the TWA bankruptcy court would have approved

the TWA Purchase Agreement and the Section 1114 motion if American's obligations were

characterized in that way.

On this record, there is not enough information to determine whether judicial estoppel

applies.  Indeed, the Court has reason to think that it does.  In any event, for purposes of

summary judgment, the Defendant has presented ample evidence to show that a genuine dispute

exists regarding this issue.  For that reason, the Court denies summary judgment with respect to

the TWA Retirees.

The Court is mindful that the parties raise many other arguments about the TWA retiree

benefits.  On the one hand, the Defendant claims that the Plaintiffs have not satisfied the $644.9

million liability and, therefore, the TWA Retirees have vested benefits.  On the other hand, the

Plaintiffs argue that the Defendant lacks standing to enforce the TWA Purchase Agreement, [30]

---

[30]     It does not appear that the Second Circuit has addressed this issue, but at least one Circuit appears to
disagree with the Plaintiffs' position.  The Third Circuit has held that when a buyer expressly assumes liabilities of a
seller, it becomes directly liable, regardless of any language in the sale agreement otherwise purporting generally to
disclaim third-party beneficiary rights.  *See Brzozowski v. Corr. Physician Servs., Inc.*, 360 F.3d 173, 177 (3d Cir.

any liabilities were contingent, and there is a reservation of rights to terminate any TWA retiree

benefits.  The Court also notes that this unusual intersection of bankruptcy, contract, and ERISA

law creates uncertainty about the applicable legal standard.  The Plaintiffs imply, through their

standing arguments, that contract interpretation principles apply, while the Defendant still

grounds the argument in the ERISA vesting analysis.  Given the Court's decision regarding

judicial estoppel, however, the Court need not decide any of these other issues today.

### CONCLUSION

For the reasons set forth above, the Court denies in part and grants in part the Plaintiffs'

motion for summary judgment.  The Defendant should settle an order on five days' notice.

Dated: New York, New York
      April 17, 2014


                                */s/ Sean H. Lane*               
                                UNITED STATES BANKRUPTCY JUDGE

---

2004).  The Third Circuit has further found that general or boilerplate language prohibiting third-party actions "must yield" to specific contractual provisions granting third parties enforceable rights in assumed liabilities.  *See Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234, 245 (3d Cir. 2005); *see also Saudi Am. Bank v. Shaw Group, Inc.* (*In re Stone & Webster, Inc.*), 558 F.3d 234, 241 (3d Cir. 2009).  The Third Circuit in *Stone & Webster* also recognized that, in the context of bankruptcy, it is necessary to consider the order approving a sale in addition to the purchase agreement, because both documents affect the parties' rights.  558 F.3d at 241 ("The Purchase Agreement, however, is not the only document relevant to determining [a third party's] rights.  The Sale Order approving the Purchase Agreement includes language protecting the rights of third parties.").